UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

PATRICIA MCDONOUGH,                          :
                                             :
                              Plaintiff,     :          MEMORANDUM
                                             :          AND ORDER
            - against -                      :
                                             :          05 CV 2507 (JG)
                                             :
NASSAU COUNTY BOARD OF                       :
COOPERATIVE EDUCATIONAL SERVICES             :
and DR. JERRY SHIVELY (in his individual     :
and official capacities), et al.,            :
                                             :
                              Defendants.     :
-------------------------------------------------------------- X

A P P E A R A N C E S :

> LEEDS, MORELLI & BROWN, P.C.
>         One Old County Road, Suite 347
>         Carle Place, NY 11514
> By:    Rick Ostrove
>        Thomas Ricotta
>        Attorneys for Plaintiff
>
> CRONIN & BYCZEK, LLP
>         1983 Marcus Avenue, Suite C-120
>         Lake Success, NY 11042
> By:    Rocco G. Avallone
>        Attorneys for Defendant

JOHN GLEESON, United States District Judge:

Patricia McDonough, a school psychologist, brings this employment

discrimination action against her employer, the Nassau County Board of Cooperative

Educational Services ("BOCES"), and Dr. Jerry Shiveley, a BOCES District Superintendent.

McDonough claims that she was wrongfully terminated from her position with BOCES

because of her Catholic faith and in retaliation for engaging in statutorily protected activity.

Compl. ¶ 13. She contends that this conduct violated Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. § 2000e et seq. and the New York State Executive Law, Human

1

Rights Law, § 290 *et seq.* She also asserts a claim pursuant to 42 U.S.C. § 1983, alleging a violation of the First and Fourteenth Amendments to the United States Constitution. Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, the motion is granted in part and denied in part.

BACKGROUND

The facts of this case, viewed in the light most favorable to McDonough, are as follows. In October 2000, McDonough began working part-time as a school psychologist for BOCES, a local agency that provides shared services to schools in Nassau County. Compl. ¶ 4. Her supervisor, Betsy Slover, assigned McDonough to service three non-public schools, the Davis Renov Stahler Yeshiva ("D.R.S.") of the Hebrew Academy of Long Beach ("HALB") (an all-boys Jewish school), Friends Academy (a Quaker school), and All Saints School (a Catholic school). McDonough Dep. 36-39. Slover retired soon after she assigned McDonough to these schools, and Linda Mancz replaced her as McDonough's supervisor. *Id*. at 40.

McDonough worked at D.R.S. from October 2000 to June 2003. *Id.* Rabbi Kaminetsky, the Hebrew principal of D.R.S, served as her on-site supervisor. *Id*. at 40-42. McDonough's duties as a BOCES school psychologist included "conduct[ing] assessments of the students; speak[ing] with faculty members concerning the students' academic or behavioral issues; [performing] consultations about the students' history, i.e., behavior at home; conduct[ing] surveys of students' behavior at home in comparison to their behavior at school; and developing strategies for students to succeed." Defendant's Rule 56.1 Statement ¶ 14; *see also* McDonough Dep. 54-55. Because McDonough was not familiar with the Torah, Rabbi Kaminetsky instructed her "not to do any counseling with the boys at D.R.S." *See* Defendant's Rule 56.1 Statement ¶ 13; *see also* McDonough Dep. 53-54. He also implored her not to wear short sleeves or pants, that is, to dress in a manner consistent with

the traditions of orthodox Jews. McDonough, herself a product of a religious education, readily agreed. McDonough Dep. 52.

A.     *The Problems with Goldberg*

While on the premises of D.R.S., McDonough shared an office with Dr. Neil Goldberg, a psychologist employed by HALB, the umbrella organization under which D.R.S. operates. *See* McDonough Dep. 41. Soon after McDonough's arrival in the fall of 2000, Goldberg shared confidential information and made inappropriate remarks about his patients to her. *See* Defendant's Rule 56.1 Statement ¶ 15; *see also* McDonough Dep. 59-63. McDonough alleges that over the next two years, Goldberg continued to make inappropriate remarks regarding his patients. The remarks were of a sexual nature and breached the confidentiality of Goldberg's patients. They also revealed an unorthodox attitude on Goldberg's part toward the sexual conduct (and sexual victimization) of his adolescent clients. McDonough Dep. 61.

These comments by Goldberg culminated in the fall of 2002, when he divulged to McDonough that he had told a child patient from a neighboring yeshiva to "relax. . . I'm not going to touch your penis or shove anything up your ass today." McDonough Dep. 85. McDonough believed that this odd reference to sexually abusing a child might be a foreshadowing of actual child abuse by Goldberg, so she finally reported Goldberg -- to the principal of the child's yeshiva, Rabbi Kov. When Goldberg found out, he complained about McDonough to Allan Weiner (the English principal of D.R.S.). Goldberg also verbally attacked McDonough at D.R.S., and accused her of "trying to ruin his business." *See* Defendants' Rule 56.1 Statement ¶¶ 23-24. *See also* Plaintiff's Rule 56.1 Counter Statement ¶ 7. Goldberg threatened to sue McDonough. McDonough Dep. at 98-100.

D.R.S. responded to the revelation of Goldberg's conduct by suspending McDonough. Specifically, Weiner called Mancz and told her to instruct McDonough not to come in for a while, so D.R.S. could evaluate its school psychologist program. Mancz told McDonough not to report to D.R.S. McDonough Dep. at 93-94.

On the same day Weiner suspended McDonough from D.R.S., McDonough told Mancz and other BOCES psychologists about Goldberg's disturbing remark concerning his patient. The reaction by BOCES was tepid; other than Mancz checking to see if Goldberg was a licensed psychologist, BOCES took no action. McDonough Dep. at 90-92.

In late December 2002, McDonough was asked to return to D.R.S. along with Mancz for a meeting with Rabbi Kaminetsky. McDonough Dep. 98. McDonough expected they would discuss Goldberg's conduct -- both the disturbing remarks McDonough had reported and the expression of concern by other rabbis over Goldberg's inappropriate remarks to teenage boys. McDonough Dep. 98-99. There was no such discussion and no resolution of the Goldberg issue. Instead, Mancz refused to support McDonough's complaints about Goldberg, and even reproached McDonough for wearing a red jacket to a Jewish school during Christmas week. *Id.* at 101.

B.     *The Rejection of McDonough by D.R.S.*

In May of 2003, Rabbi Kaminetsky informed McDonough that he did not want her to return to D.R.S. Kaminetsky had no issues with McDonough's work. To the contrary, he described it as perfect, and much appreciated by the school. McDonough Dep. 103. However, the problem between Goldberg and McDonough had become too much of a concern for Kaminetsky, and he was not prepared to fire Goldberg, so McDonough had to leave. Defendant's Rule 56.1 Statement ¶ 30; Kaminetsky Let. Ex. F.

Once Kaminetsky made that decision, BOCES was not in a position to require D.R.S. to retain McDonough as its school psychologist. McDonough Dep. 109; *see also*

Defendants' Rule 56.1 Statement ¶ 32. Adapting to Kaminetsky's wishes, Mancz hired an orthodox Jew to serve in McDonough's position at D.R.S. *Id.* at 110.

C.     *The Unsuccessful Effort to Place McDonough*

In the summer of 2003, McDonough, having been rejected by D.R.S., was in need of placement, and Stella Kirks Abraham ("S.K.A.") was in need of a psychologist. McDonough Dep. 108. Mancz recommended that BOCES place McDonough there. *Id.* However, S.K.A. was a sister school of D.R.S., and both schools were part of HALB. And Rabbi Glass, the Director of all of the HALB schools, conveyed a message to BOCES through S.K.A.'s principal that McDonough would not even be allowed on the property.[1] *Id.*

McDonough became concerned that her reputation was being compromised in the orthodox Jewish community and elsewhere in the larger "Five Towns" community in which it was situated, where most of the BOCES assignments were made. Mancz observed to McDonough, "I don't know what we are going to do with you."

McDonough contends that BOCES soon decided what to do with her: it would manufacture a basis to fire her.

D.     *The Campaign to Terminate McDonough*

McDonough alleges that BOCES built a bogus record to justify firing her. The real reason for firing her, she claims, was to placate the religious schools BOCES served. But for the fact that she was Catholic, McDonough claims, she would not have been terminated by BOCES.

There were three components of the alleged campaign to fire McDonough. Each is discussed below.

---

[1]     Mancz recommended McDonough for work in another Jewish school, the Hebrew Academy of Five Towns and Rockaway, (HAFTR), but McDonough declined to work there because the school included the same population that Goldberg treated, and it was near his office. *See* McDonough Dep. 111. *See also* Defendants' Rule 56.1 Statement ¶ 35; Plaintiff's Rule 56.1 Counter Statement ¶ 15.

1.    <u>Poor Judgment in Communicating with Private Schools and Colleagues</u>

In October 2003, Mancz and her supervisor, Dr. Marguerite Costello, convened two meetings to address McDonough's alleged inappropriate communications with the local schools and with her colleagues. First, in a letter dated September 26, 2003 from Linda Mancz, McDonough was summoned to a meeting for Tuesday, October 7, 2003 "to discuss [her] professional conduct regarding communications with private schools and school districts." Mancz Let. Ex. D. A few weeks later, Linda Mancz called another meeting for October 29, 2003, the purpose of which was "to discuss [McDonough's] professional conduct regarding communications with colleagues." Mancz Let. Ex. E.

At these meetings, Mancz and Costello accused McDonough of having inappropriate conversations with the school psychologist at Friends Academy about McDonough's placement. McDonough Aff. 123-24. McDonough claims that these conversations did not take place. Defendant's Rule 56.1 Statement ¶ 44; Plaintiff's Rule 56.1 Counter Statement ¶ 22; s*ee also* McDonough Aff. 124. During the summer of 2003, McDonough did communicate with school officials at Ketana Yeshiva and at Our Lady of Peace School to discuss her placement. McDonough Dep. 118, 120. Additionally, she spoke with Sue Wilks, Our Lady's BOCES psychologist, regarding her placement for the 2003-2004 school year. McDonough Dep. 116. McDonough and Wilks discussed the possibility of McDonough taking over Wilks's position at Our Lady. McDonough also contacted the priest and principal of Our Lady requesting that she take over Wilks's position. McDonough Dep. 122.

According to McDonough, there was nothing wrong with these conversations, which did not violate any professional codes or BOCES policies. Indeed, this type of communication among BOCES employees was normal and encouraged. Defendants' Rule 56.1 Statement ¶ 43; Plaintiff's Rule 56.1 Counter Statement ¶ 21. *See also* McDonough

Dep. 117-18; Costello Dep. 20-21.   In any event, during the October meetings, neither

Mancz nor Costello focused on McDonough's communications about her placement with her

colleagues and the schools.  McDonough Dep. 124.  Rather, they used these meetings to

confront McDonough – without notice – with a more pressing topic: an allegation that

McDonough had improperly revealed confidential information about a student to another

school.  McDonough Dep. 114, 127, 159-60.

    2.    <u>Disclosure of Confidential Information Regarding a Student</u>

    In September 2003,  Costello received a letter from the parents of former

D.R.S. student Scott Topiel, lodging a formal complaint that McDonough had

"communicated private, confidential and privileged information" about him to the principal

of HAFTR, hindering his acceptance to HAFTR.  Defendants' Rule 56.1 Statement ¶ 45;

Topiel Let. Ex. G.  McDonough denies that she provided any substantive information about

Topiel.  Indeed, she never had any contact with him while he was a student at D.R.S., and

was merely fulfilling Kaminetsky's request when she made a brief call to HAFTR's

principal, asking him to fax over Topiel's records.  McDonough Dep. 125-26; Plaintiff's Rule

56.1 Counter Statement ¶¶ 23-24.  McDonough believes that Topiel's parents learned of her

phone call to HAFTR through Mancz, McDonough Dep. 129, 156-7, and that the letter was

written at the behest of Goldberg.  Defendants' Rule 56.1 Statement ¶ 52; Plaintiff's Rule

56.1 Counter Statement ¶ 26.

    As McDonough soon realized, "the real point of the [October 7] meeting was

to state that [McDonough] had revealed confidential information about [Topiel] to the

administration of HAFTR that prevented [him] from being admitted."  McDonough Dep.

114.  With little investigation into the truth of the matter, Costello reprimanded McDonough

"for having such bad judgment as to reveal any kind of confidential information to HAFTR

about the Topiel boy.  She was very accusatory, it was not a discussion, it was a conclusion

that I had done it." McDonough Dep. 130. The Topiel incident would later constitute the second ostensible reason for McDonough's termination.

### 3. Timekeeping Discrepancies

On November 7, 2003, McDonough received a third letter from Mancz, summoning her to another meeting "to discuss [her] time keeping." Ex. I. At the beginning of her employment with BOCES, Mancz had instructed McDonough to fill out her time sheet each day to indicate a 9:00 am arrival and a 3:30 pm departure. *See* McDonough Dep. 137-38, 145. McDonough's actual schedule, of which Mancz was "well-aware," began later than 9:00 am because of morning prayers at D.R.S and often extended beyond 3:30 pm, sometimes late into the night. *Id.* at 139-41; *see also* Plaintiff's Rule 56.1 Counter Statement ¶ 28. Still, McDonough testified that she had always kept her time records in accordance with the instruction she had received, and only after the Goldberg complaint did her timekeeping become an issue. McDonough Dep. 136. During the period of McDonough's employment, BOCES employees were confused as to how to fill out the time sheets. At a meeting in 2001, Mancz instructed the employees to continue filling them out as they had been, even if the recorded hours did not reflect the actual hours worked. McDonough Dep. 138. Though McDonough's timesheets may have been inaccurate, it was only because she "put in many more hours than . . . reflected on those time sheets," often finishing up her work at home. McDonough Dep. 141, 145. Regardless, in November 2003, according to Dr. Shiveley, McDonough's inaccurate timekeeping formed the third and final basis for her termination.

### 4. The Termination

In a letter dated January 21, 2004, Dr. Shiveley informed McDonough that at the February 26, 2004 Board meeting he would recommend that her services be terminated as of March 27, 2004. Defendants' Rule 56.1 Statement ¶ 58; Plaintiff's Rule 56.1 Counter

Statement ¶ 31.  McDonough requested an explanation, and Shiveley wrote that his recommendation was based on her "(a) poor professional judgment in communicating with colleagues and schools; (b) disclosure of confidential information regarding a student; and (c) inaccurate reporting of her time schedule at assigned school."  *See* Defendants' Rule 56.1 Statement ¶ 59; Plaintiff's Rule 56.1 Counter Statement ¶ 31; *see also* Ex. N.

On February 27, Costello informed McDonough that her termination from BOCES was effective as of March 28, 2004.  *See* Defendants' Rule 56.1 Statement ¶ 60; Plaintiff's Rule 56.1 Counter Statement ¶ 31.  On April 1, 2004, Shiveley wrote to McDonough that her termination from BOCES "had absolutely no connection to [her] religious affiliation.  Rather, the termination was based on legitimate performance considerations as previously indicated by [BOCES] to you."  *See* Ex. P.  *See also* Defendants' Rule 56.1 Statement ¶ 61; Plaintiff's Rule 56.1 Counter Statement ¶ 31.

DISCUSSION

A.     *The Summary Judgment Standard of Review*

Under Rule 56 of the Federal Rules of Civil Procedure, the moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party must demonstrate that no genuine issue exists as to any material fact.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994).  For summary judgment purposes, a fact is "material" when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Accordingly, in determining whether an issue is genuine, "the inferences to be drawn from the underlying facts... must be viewed in the

light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and citation omitted).

Once the moving party has met its burden, "the nonmoving party must come

forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587

(quoting Fed. R. Civ. P. 56(e)) (emphasis omitted). Critically,

> the moving party may obtain summary judgment by showing that
> little or no evidence may be found in support of the nonmoving
> party's case. When no rational jury could find in favor of the
> nonmoving party because the evidence to support its case is so slight,
> there is no genuine issue of material fact and a grant of summary
> judgment is proper.

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994)

(citations omitted). The nonmoving party cannot survive summary judgment by casting mere

"metaphysical doubt" upon the evidence produced by the moving party. *Matsushita*, 475 U.S.

at 586.

B.      *McDonough's Claims*

1.      <u>Religious Discrimination by BOCES</u>[2]

Title VII religious discrimination claims at the summary judgment stage are

analyzed using the burden-shifting paradigm articulated in *McDonnell-Douglas,* 411 U.S.

792 (1973). Under this analysis,

> a plaintiff first bears the "minimal" burden of setting out a prima facie
> discrimination case, and is then aided by a presumption of
> discrimination unless the defendant proffers a "legitimate,
> nondiscriminatory reason" for the adverse employment action, in
> which event, the presumption evaporates and the plaintiff must prove
> that the employer's proffered reason was a pretext for discrimination.

---

[2]      The standards applicable to a Title VII claim are also used for the New York State
Executive Law claims. *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003). Only BOCES is a
defendant in the Title VII claim. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995) (the
organization is the defendant in a Title VII action, not its employees). Both BOCES and Shiveley are
defendants in the claim brought pursuant to the New York State Executive Law. Because BOCES acted
through Shiveley, the disposition of the Execution Law claim against BOCES controls the disposition of
the claim against Shiveley.

*McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006) (citations omitted).

### a. The Prima Facie Case

To establish a prima facie case of discrimination, the plaintiff must show (i) membership in a protected class; (ii) qualifications for the position; (iii) an adverse employment action; and (iv) circumstances surrounding that action giving rise to an inference of discrimination. *Texas Dep't. of Cnty Affairs v. Burdine,* 450 U.S. 248, 252-253 (1981); *Collins v. NYC Transit Auth.,* 305 F.3d 113, 118 (2d Cir. 2002). While the defendants concede that McDonough belonged to a protected class and was subjected to an adverse employment action, they argue that she has not satisfied the second and fourth elements of the prima facie case.

### (1) Qualifications for the Position

Defendants' contention that McDonough was unqualified for the position because of her unsatisfactory job performance has no merit. McDonough bears only a "minimal" burden in establishing that she was qualified for the position. *See Zimmerman v. Associates First Capital Corp*., 251 F.3d 276, 381 (2d Cir. 2001) ("We have characterized the evidence necessary to satisfy this initial burden as 'minimal' and '*de minimis.*'"). She need only show that she "possesses the basic skills necessary for the job." *Slattery v. Swiss Reinsurance America Corp*., 248 F.3d 87, 92 (2d Cir. 2001) (quoting *Owens v. New York City Housing Auth.* 934 F.2d 405, 409 (2d Cir. 2001)).

Defendants argue that McDonough was unqualified for the position because of her "poor professional judgment in communicating with colleagues . . . inaccurate reporting on time sheets, and disclosure of confidential information regarding a student." Defendants' Memorandum of Law In Support of Defendants' Motion for Summary Judgment

("Def. Br.") 4. These are the very same reasons BOCES gave to explain McDonough's termination. *See* Defendants' Rule 56.1 Statement ¶ 59; Plaintiff's Rule 56.1 Counter Statement ¶ 31; *see also* Ex. N. As discussed below, McDonough has established a genuine issue of fact as to whether each of BOCES' explanations for her termination was a pretext.

Even putting aside the evidence of pretext, the record reflects that McDonough easily satisfies the second element of her prima facie case. Viewing the facts in the light most favorable to McDonough, she possessed more than the basic skills necessary for the job. Indeed, the school supervisors gave her exemplary evaluations, lauding her dedication to D.R.S. and its students. Even the defendants concede that plaintiff received "primarily positive" work evaluations. *See* Def. Br. 4. In short, McDonough has provided more than the minimal amount of evidence required to demonstrate that she was in fact qualified for her position as a school psychologist with BOCES.

(2) The Inference of Discrimination

Defendants contend that McDonough has failed to satisfy the fourth element of the prima facie case because she does not allege circumstances that give rise to an inference of discrimination. I disagree. McDonough has presented evidence of various events that support an inference that BOCES yielded to wishes of the schools to which it provided psychologists, and in so doing engaged in unlawful religious discrimination against McDonough.

For example, in the fall of 2002, McDonough reported to Rabbi Kov Goldberg's sexually charged statements to a young student in Rabbi Kov's school. Goldberg found out, and complained about McDonough to Weiner, the English principal of D.R.S. Weiner responded by temporarily banning *McDonough*, not Goldberg from D.R.S. while the school evaluated its psychology program. McDonough correctly asserts that a jury could conclude that she was barred from D.R.S. because of her complaints regarding Goldberg.

12

Then, when she and Mancz returned to the school in late December to meet with Weiner, Mancz not only failed to support McDonough, she berated her for wearing a red jacket to a Jewish school during Christmas week. McDonough is entitled to argue, and a jury could reasonably conclude, that BOCES was more interested in placating the schools in which BOCES placed its psychologists than in defending her actions or, for that matter, taking the appropriate steps to ensure the safety of Goldberg's patients.

The circumstances surrounding McDonough's ejection from D.R.S. contribute to an inference of religious discrimination by D.R.S. Rabbi Kaminetsky had no complaints about McDonough's performance of her duties as a school psychologist, and indeed he praised that performance. And there has never been even a contention (let alone a showing) that McDonough's complaints about Goldberg were unfounded or insignificant. Rather, as Kaminetsky put it to McDonough, one of them had to go, and Kaminetsky decided it would be McDonough. In light of all the circumstances, McDonough may properly contend that D.R.S.'s basis for choosing McDonough as the one to be ejected from D.R.S. was, at least in part, her religion. Similarly, when Kaminetsky wrote to Mancz that "the needs of the overall school and the students would be better served if someone else was sent to our school from BOCES," McDonough may properly contend that this was a thinly-disguised directive to BOCES to replace McDonough with an orthodox Jewish psychologist, which BOCES in fact did.

The directive from Rabbi Glass in the summer of 2003 that McDonough not be allowed on the property of S.K.A., D.R.S.'s sister school, further supports her claim. Again, neither BOCES nor the schools at issue even attempt to justify that directive on the merits. McDonough's ability to perform her duties well had not previously been questioned by anyone. A fair inference from the facts adduced by McDonough is that she became unwelcome at all the orthodox Jewish schools BOCES served because of her religion.

13

Finally, McDonough contends that the religious discrimination by others became religious discrimination by BOCES when it terminated her soon thereafter. The relationship between BOCES and the Jewish schools it served lies at the heart of McDonough's case. She contends that BOCES' actions throughout the relevant period reflect its acquiescence in the schools' desire to keep her out of those schools because she is a Catholic. In December of 2002, when Goldberg should have been pursued, BOCES did nothing beyond checking his license. When Mancz accompanied McDonough to D.R.S. later that month, Mancz not only failed to support McDonough or press D.R.S. about Goldberg, she upbraided McDonough for wearing red in a Jewish school. Then, during 2003, when it no longer made sense to continue employing McDonough if her religion precluded her placement in a Jewish school, BOCES manufactured three reasons to fire her. Thus, according to McDonough, what began as religious discrimination against her by D.R.S. became religious discrimination by BOCES.

I conclude that the facts proffered by McDonough, if believed by a jury, support her claim that she was terminated in circumstances giving rise to an inference of discrimination.

b.      BOCES' Proffered Non-discriminatory Reasons

Under the *McDonnell-Douglas* framework, once the plaintiff has established a prima facie case, the defendant must proffer a legitimate non-discriminatory reason for the adverse employment action. *McPherson*, 457 F.3d at 215. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prod. Inc*., 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509 (1993)).

BOCES justifies firing McDonough because of her "(a) poor professional judgment in communicating with colleagues and schools; (b) disclosure of confidential

information regarding a student; and (c) inaccurate reporting of time schedule at assigned school." Defendants' Rule 56.1 Statement ¶ 59; Plaintiff's Rule 56.1 Counter Statement ¶ 31; *see also* Ex. N. Defendants have thus met their burden.

c. Pretext

McDonough must provide facts sufficient to warrant a reasonable jury finding by a preponderance of the evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prod. Inc.*, 530 U.S. 133, 143 (2000). The "plaintiff . . . need not disprove a defendant's proffered rationale for its adverse actions in order to prevail." *Gordon*, 232 F.3d at 117. Rather, McDonough could prevail on this point merely by proving that BOCES relied upon an "impermissible factor [as] a 'motivating factor,' without proving that the employer's proffered explanation was not some part of the employer's motivation." *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities,* 115 F.3d 116, 120 (2d Cir. 1997). As discussed earlier, McDonough has created a genuine issue about whether an impermissible factor (*i.e.*, as a Catholic, McDonough did not satisfy the demands of BOCES' customers) was one of the motivating factors in BOCES' decision to terminate her services. Whether the proffered reasons masked a desire to acquiesce in the alleged discriminatory motives of the Jewish schools is a question of fact for the jury.

In addition to the incidents described in Part B(1)(a)(2) that give rise to an inference of discrimination, McDonough presents facts sufficient to warrant a finding that Shiveley terminated her on the basis of trumped-up charges. With regard to the charge that she exercised poor professional judgment in interacting with her colleagues and schools, McDonough claims that such conversations were not only permissible but encouraged, and certainly not forbidden by any BOCES policy or rule. Plaintiff's Rule 56.1 Counter Statement ¶ 21. Likewise, she alleges sufficient facts showing that the charge of revealing

confidential information is baseless. The defendants dispute those facts, but viewing them in the light most favorable to McDonough, she did not reveal any information about the student at issue to HAFTR's principal. Finally, McDonough provides a reasonable and, if believed, convincing explanation for her challenged record-keeping: she was instructed to keep her time in this manner; she had been doing so for the prior three years; and her supervisors had known all along that the time designations did not match the actual hours she kept.

In sum, various genuine issues of material fact preclude the grant of summary judgment to defendants on McDonough's claim that her termination by BOCES constituted unlawful discrimination on the basis of religion.

2.    The Title VII Retaliation Claim

To establish an unlawful retaliation claim under Title VII, McDonough must show that: (1) she engaged in a protected activity; (2) BOCES was aware of the activity; (3) an adverse employment action took place; and (4) there was a causal connection between the protected activity the adverse action. *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir. 1993).

In her opposition to the defendants' motion, McDonough asserts in a footnote that she clearly pleaded a Title VII retaliation claim in which her protected activity was complaining to Mancz about Goldberg's inappropriate sexual comments, and that the defendants did not address that claim. I disagree with the first contention. The Second Amended Complaint does not plead a Title VII retaliation claim on the basis of sexual harassment. Rather, it alleges that "BOCES wrongly discriminated and retaliated against Plaintiff based, in part, on her religion, and/or opposition to discriminatory practices." Compl. ¶ 33. That opaque allegation did not sufficiently apprise the defendants that McDonough was claiming that she had complained of sexual harassment *of her*, and that BOCES then retaliated against her for doing so. That theory of liability did not surface in the

16

case until McDonough raised it on this motion, in the manner described above. Thus, I conclude the claim must be dismissed, and note that at oral argument of the motion, plaintiff's counsel agreed that dismissal was appropriate.

       3.      The § 1983 Claim against BOCES and Dr. Shiveley for Abridging
              <u>McDonough's First Amendment Right</u>

       In order to establish a claim under § 1983, a plaintiff must show that she has been deprived of a federal right by a person acting under color of state law. *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998). McDonough claims that her First Amendment rights were violated when BOCES retaliated against her for issuing complaints about Goldberg. Defendants do not contest that they acted under color of state law.

       The First Amendment to the United States Constitution provides, *inter alia*, that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. Amend. I. "[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers,* 461 U.S. 138 (1983) (citing *Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968)); *see also Johnson v. Ganim,* 342 F.3d 105, 112 (2d Cir. 2003) ("Few values are more carefully and thoroughly protected than the citizen's right to speak his mind on matters of public concern without interference by the government.") (quotation marks omitted).

       First Amendment claims brought under § 1983 require the plaintiff to show that (1) the speech at issue was protected, *i.e.,* it was made as a citizen on matters of public concern; (2) she suffered an adverse employment action; and (3) there was a causal connection between the speech and adverse action. *See Philips v. Bower*, 278 F.3d 103, 109 (2d Cir. 2002); *see also Johnson,* 342 F.3d at 112. "If a plaintiff establishes these three factors, the defendant has the opportunity to show by a preponderance of the evidence that it would have taken the same adverse employment action 'even in the absence of the protected

conduct."' *Morris*, 196 F.3d at 110 (quoting *Mount Healthy,* 429 U.S. at 287). Defendants do not dispute that McDonough engaged in protected speech and suffered an adverse employment action. They do contend, however, that her termination from BOCES is not linked to her complaints about Goldberg.

As discussed above, this is a matter for the jury to decide, for McDonough has alleged sufficient facts to warrant a finding that her termination from BOCES was connected to her speech. McDonough need only present facts that show that the protected speech "was a substantial motivating factor in the adverse employment [action]," *Morris,* 196 F.3d at 110. This can be demonstrated "indirectly, by showing that the protected activity was followed closely by discriminatory treatment." *Gordon v. New York City Bd. Of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). While the Second Circuit has refrained from articulating a "bright-line" rule, "the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman-Bakos,* 252 F.3d 545, 554 (2d Cir. 2001), the sequence of events and the timing may be suggestive. *See, e.g., Cioffi v. Park Central School Dist. Bd. Of Ed.*, 444 F.3d 158, 168 (2d Cir. 2006) ("[T]he lapse of only several months . . . between the protected speech and adverse employment action is sufficient to support an allegation of a causal connection strong enough to survive summary judgment.").

McDonough's first attempt to discuss Goldberg's misbehavior was immediately followed by Weiner's direction to BOCES that McDonough not report to D.R.S. while it evaluated its school psychologists program. When she returned to the school in late December, McDonough again sought to discuss Goldberg's conduct. By the spring 2003, D.R.S. asked BOCES to replace her, and within months BOCES began compiling what a jury could find were bogus charges to justify her termination from BOCES.

Defendants contend that McDonough would have been discharged from BOCES regardless of her complaints about Goldberg. Maybe so, but that is a matter for a jury to decide, as McDonough has alleged facts sufficient to warrant a finding that BOCES' stated reasons for her termination were pretextual, and that she was terminated from the BOCES program because of her speech.

C.      *Dr. Shiveley's Qualified Immunity Claim*

Shiveley claims he is entitled to qualified immunity. To sustain that claim, he must demonstrate that he did not violate McDonough's clearly established statutory or constitutional rights or that it was objectively reasonable for him to believe that his acts did not violate these clearly established rights. *Genas v. Dep't of Correctional Servs.,* 75 F.3d 825 (2d Cir. 1996); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Under *Lennon v. Miller*, 66 F.3d 416 (2d Cir. 1995), a defendant who asserts a qualified immunity defense in a summary judgment motion will not be entitled to summary judgment when a reasonable jury, looking at the evidence in the light most favorable to the plaintiff, and drawing all inferences in her favor, could conclude that it was not objectively reasonable to believe that defendant was not violating a clearly established federal right. Where the parties' versions of the facts "differ markedly," as they do in here, "[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." *See Kerman v. New York*, 201 F.3d 229, 240 (2d Cir. 2001) (quoting *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir. 1999)).

If McDonough's version of the facts is accepted by a jury, Shiveley (1) became aware that McDonough spoke out on a matter of undisputed public concern -- troubling remarks (potentially foretelling even more troubling behavior) by a school psychologist; (2) became aware that schools served by BOCES had retaliated against McDonough for speaking out by refusing to allow her to work in those schools; and (3)

became complicit in that retaliation by firing McDonough for the same reason, masked by the bogus reasons set forth in his letter dated January 30, 2004. No reasonable person could find on those facts that Shiveley's actions were objectively reasonable. Moreover, given Shiveley's relationship to Mancz and his involvement during the period from late January 2004 into April of that year, *see* defendants' Exhibits M, N, and P, it cannot be said as a matter of law that he lacked sufficient personal involvement in the claimed retaliation to support a finding of liability.

In sum, the facts as found by a jury may warrant revisiting Shiveley's qualified immunity claim, but at this stage of the proceedings it must be denied.

D.     *Municipal Liability*

Under *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978), a municipality will not be held liable for the actions of its employees under the doctrine of respondeat superior. However, the municipality may be liable if the constitutional deprivation occurred "pursuant to a governmental 'custom' even though such a 'custom' has not received formal approval through the body's official decision making channels." *Id.* at 694. When the offending municipal employee is also the "final policy-making authority," the actions of that authority figure can be imputed to the municipality. *See Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000). *See also Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ("[O]nly those municipal officials who have 'final policy making authority' may by their actions subject the government to § 1983 liability."). A policymaker is the employee who can make final employment decisions, "not subject to de novo review by higher ranking officials." *City of St. Louis v. Prapotnik*, 485 U.S. 112, 112 (1988). "Whether the official in question possessed final policymaking authority is a legal question" resolved by state law. *Jett,* 491 U.S. at 737; *McMillan v. Monroe County*, 520 U.S. 781, 786 (1997).

Under the New York Education Law §1950(5)(e), the District Superintendent of BOCES is the executive officer of the Board, and "upon his recommendation" the Board is instructed to employ teachers and other professionals who provide services to the schools. It appears that to the extent the New York Commissioner of Education does not oversee the District Superintendent's decisions, his decisions are final, empowering him as the "final policymaking authority." Shiveley, as District Superintendent, terminated McDonough's employment. He also was the official who responded to her appeal to be reinstated. Ex. P. Implicit in this correspondence is that his decision in this arena is final, thereby qualifying him as the final policymaking authority.

"Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur." *Jeffes*, 208 F.3d at 61 (citing *Monell,* 436 U.S. at 661). Viewing the facts in the light most favorable to McDonough, a rational jury could find that Shiveley, as the final policymaking authority, set practices that indirectly condoned his subordinates' discriminatory practices. I therefore deny the defendants' claim that municipal liability may not be imposed.

CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied with respect to McDonough's claim of religious discrimination under Title VII and the parallel state law, and with respect to her claim of retaliation under §1983. The motion is granted with respect to the Title VII retaliation claim on the basis of sexual harassment. Jury

selection and trial will occur on Monday, January 7, 2008 at 9:30 AM.  A final pretrial

conference will be held on Thursday, December 27, 2007 at 10 AM.

So ordered.




John Gleeson, U.S.D.J.



Dated:  Brooklyn, New York
          October 25, 2007